**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:08-CR-0424-01** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **CARLOS SANTIAGO-PAGAN,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Presently before the court is defendant Carlos Santiago-Pagan's motion (Doc. 103) for bail pending trial.  The court held a detention hearing pursuant to 18 U.S.C. § 3142 on March 26, 2009,[1] after which defendant filed a supplemental brief (Doc. 139) in support of the motion.  Both parties also submitted post-hearing evidentiary exhibits.  For the reasons that follow, the motion will be denied.

**I.    <u>Findings of Fact</u>[2]**

On November 19, 2008, a grand jury returned a three-count indictment charging defendant and four co-conspirators with (1) criminal conspiracy to

---

[1] Citations to the March 26, 2009 hearing transcript are abbreviated throughout as "Hr'g Tr."

[2] The court finds that the facts described herein are supported by clear and convincing evidence, as required by 18 U.S.C. § 3142(f).  The findings are based on testimonial and documentary evidence presented at the detention hearing, as well as the post-hearing exhibits tendered to the court by joint agreement of the parties. The government has submitted a binder tabbed A through M containing transcripts of telephonic communications intercepted pursuant to a court-authorized wiretap. Citations to the transcripts within this binder are abbreviated throughout as "Gov't Ex. Tab ___."  Defendant has also submitted a selection of wiretap transcripts, which are duplicative of, but less comprehensive than, the government's binder.  In addition, both parties provided the court with compact discs containing unedited transcripts of intercepted telephone communications.

distribute and possess with intent to distribute cocaine hydrochloride and

marijuana in violation of 21 U.S.C. § 846; (2) intentional and knowing distribution

and possession with intent to distribute cocaine hydrochloride and marijuana in

violation of 21 U.S.C. § 841(a)(1); and (3) criminal forfeiture under 18 U.S.C.

§ 981(a)(1)(C) and 21 U.S.C. § 853.  (See Doc. 1.)  A superseding indictment was

returned on December 10, 2008, which amended each of the original counts to

charge defendant with distribution, possession with intent to distribute, and

conspiracy to distribute fifty or more grams of cocaine base.  (See Doc. 31.)  On

January 7, 2009, defendant entered a plea of not guilty to the superseding

indictment.  (See Doc. 61.)  The United States magistrate judge then ordered

defendant to be detained pending trial.[3]  (See Doc. 67.)

Defendant was arrested on August 23, 2008 near Greensboro, North Carolina

after local law enforcement officers conducted a search of his vehicle and

discovered approximately one kilogram of cocaine.  (See Hr'g Ex. 2.)  This search

was preceded by several weeks of telephonic and visual surveillance, the former of

which was conducted pursuant to a court-authorized wiretap.  (See Hr'g Ex. 3.)

The sum of the government's evidence demonstrates that throughout August 2008,

defendant frequently used telephones to arrange for the purchase and resale of

narcotics.  Accordingly, the court will reproduce a sampling of the

---

[3] Defendant is entitled to seek review in the district court of a magistrate judge's detention order.  In such circumstances, the district court reviews the magistrate judge's decision de novo.  See United States v. Delker, 757 F.2d 1390, 1394 (3d Cir. 1985).

conversations—spoken largely in code—that ultimately led to defendant's arrest,

the seizure of cocaine from his vehicle, and his eventual indictment.[4]

On August 14, defendant received a telephone call from an individual named

Santana, who advised that he "still h[ad] that girl." (Gov't Ex. Tab M at 2.) The

following conversation then transpired:

| | |
|---|---|
| PAGAN: | How much? |
| SANTANA: | There are four (4) left. |
| PAGAN: | Four (4)? |
| SANTANA: | There are four (4) left. |
| PAGAN: | How much? |
| SANTANA: | At seven fifty (7.50). |
| PAGAN: | Oh, that's expensive! . . . Give me two (2) if you can, or you can't? |
| SANTANA: | Just two (2)? |
| PAGAN: | At least two (2). . . . |
| SANTANA: | Okay . . . I'm on my way there. |

(Id.)

The following day, an individual named Julio contacted defendant. They

proceeded to discuss an impending transaction:

| | |
|---|---|
| JULIO: | Do you have food or what? |
| PAGAN: | Yes. |
| JULIO: | And how is it? |

---

[4] The court's consideration of the evidence derived from the government's wiretap is not intended to reflect upon the ultimate determination of defendant's guilt or innocence. See 18 U.S.C. § 3142(j). Quite simply, the court must assess the weight of the evidence against defendant, see § 3142(g)(2), and the conversations reproduced infra provide strong evidence that defendant was engaged in the purchase and resale of narcotics. The admissibility of the wiretap evidence at trial is the subject of an unresolved motion to suppress. (See Doc. 95.) A hearing on that motion is scheduled for April 28, 2009. (See Doc. 140.) For purposes of the instant motion, however, the court may consider the wiretap evidence as presented by agreement of the parties. See also § 3142(f).

3

PAGAN:   At about eighty (80).
JULIO:   How much?
PAGAN:   You mean how much for it?
JULIO:   Yes.
PAGAN:   Forty-eight (48).
JULIO:   But how . . . how is it?  Like what you had before?
PAGAN:   Yes, dude.
JULIO:   Like what you had before?
PAGAN:   Uh-huh.
JULIO:   Oh, alright.
PAGAN:   Not mixed, dude.  You heard?
JULIO:   [Stutters] It's not too tasteless, right?
PAGAN:   No, it's good.

(Id. at 19.)  Defendant and Julio then arranged to meet in twenty minutes.  (Id.)

On August 16, defendant contacted "Hugo," an apparent drug distributor residing near Greensboro, North Carolina.  Defendant and Hugo discussed the details of a future transaction:

HUGO:   . . . I am going to bring them at 9½[,] do you think that something could be done?  But right away to do it or I would not do it.
PAGAN:   Could you do it at 2 with 9?
HUGO:   I was telling you that they gave it to me too high . . . and on top of that they are going to lend them to me and it's hard to carry it up there[.] [T]he thing is that and my relative needs some too and wanted [me to] help him but that's all I can do at 9½[.] . . . [They] would like for you to go there where the job is because they don't want to move anything an[d] they have a lot there.
PAGAN:   Well at least give them to me at 2 with 9 to make one peso right away.  You know that everything is guaranteed.
HUGO:   Talk to your people and I can give them to you like that but with the money up front so I don't have to go up there and since I don't know these guys . . . .
PAGAN:   Now if I call[,] dude[,] is it a sure shot? . . .
HUGO:   Let me talk to this guy.  How many would you need?
PAGAN:   For sure I can get 5 because you are not giving me a break as far as the move that I usually do, do you understand? . . .
HUGO:   Okay . . . make sure with your buddy . . . .

4

PAGAN:        Let me call you right back.

(Gov't Ex. Tab G at 6-7.)  Within minutes, defendant contacted indicted co-

conspirator Juan Matos ("Matos") to discuss this potential purchase:

| | |
|---|---|
| PAGAN: | He can come over to me, because it appears as if he's coming to visit one of his relatives. |
| MATOS: | Uh ha. |
| PAGAN: | So he's going to bring him a hand.  And what he was telling me was that he can possibly give me one hand. . . . |
| MATOS: | Tell him to come. |
| PAGAN: | Oh!  Oh!  Wait, I just remembered.  So, the number is kind of high. |
| MATOS: | What's high? |
| PAGAN: | The three with the zero. . . . |
| MATOS: | It's okay.  As long as the quality is the same. |

(Gov't Ex. Tab F at 45-46.)

Over the next several days, defendant made arrangements to travel to North

Carolina to meet with Hugo.  On August 21, he contacted indicted co-conspirator

Angel Guzman ("Guzman") and stated, "my friend called me and he told me it's a

done deal."  (Gov't Ex. Tab J at Session #763.)  Defendant continued, explaining, "I

already spoke with him and he told me if we don't go we can look bad and when we

really need something they are not going to give us anything."  (Id.)  Defendant and

Guzman made plans to leave for North Carolina the following day.  (See id.)  Before

terminating the call, defendant reminded Guzman:  "But it's a done deal, dude and

we can't look bad after his eyes because this guy already . . . ordered it, and we can't

look [expletive] bad, we can't let it pass by after tomorrow, we can't leave this

opportunity to go by to meet this guy."  (Id.)

Approximately two hours later, defendant called Hugo to "see if there is something good so we can leave." (Gov't Ex. I at 2.) Hugo replied, "Yes, there is a buddy here. I'm with him here and he's got a 'hand' already." (Id. at 3.) Defendant asked if "they look good," and whether he should meet Hugo the soon. Hugo then stated, "If you want to come over here, it is ready, but the number is high." (Id.) Hugo advised defendant to meet him in North Carolina the following night. (Id.)

On August 22, defendant and indicted co-conspirators Guzman, Carlos Alberto Perez ("Perez"), and Juan Matos ("Matos") began driving to North Carolina to meet with Hugo. Defendant spoke with Hugo several times during the trip. (See Gov't Ex. Tab I.) During one such conversation, Hugo assured defendant regarding the quality of the soon-to-be-purchased products:

> HUGO:     Alright. So we are clear. It will be two 8s and two?
> PAGAN:    Yes, dude. And you said that they're not dark right?
> HUGO:     I'm telling you that they're not dark. We've been working for a while and it is good. But to avoid surprises, I'll say they are good, you won't have problems.

(Id. at 11.) The following day, August 23, defendant again contacted Hugo and asked, "Is it all for sure man?" Hugo replied, "They just finished calling me. The[y] told me that they have seven people ready to work." (Id. at 36.) In a subsequent call, Hugo told defendant, "The 'hand' is there." (Id. at 37.)

Defendant and Hugo eventually arranged a location at which to meet in Greensboro. (See id. at 38-44.) After the meeting, the four co-conspirators set off on the return drive to Pennsylvania. Law enforcement officers—who were monitoring defendant's telephonic communications with Hugo and surveilling his actual

6

movements as the meeting occurred—stopped and searched the conspirators'
vehicle in Guilford County, North Carolina.  (Hr'g Ex. 2.)  Officers seized one
kilogram of cocaine from the vehicle's rear cargo area, which precipitated
defendant's immediate arrest.  (Id.; see also Hr'g Ex. 3 at 7-9.)

On March 26, 2009, the court held a detention hearing pursuant to 18 U.S.C.
§ 3142(f).  The government presented no witnesses, but instead proceeded by
proffer and the submission of post-hearing exhibits.  Defendant called two
witnesses.  The first, Jessica Lugo ("Lugo"), is a resident of Reading, Pennsylvania
and has been married to defendant for six years.  (Hr'g Tr. at 4.)  Lugo testified that
several of defendant's family members reside in Reading, that he has no drug or
alcohol problems, and that he has maintained fairly continuous employment during
the course of their marriage.  (Id. at 5-7, 12.)  She admitted, however, that defendant
was unemployed at the time of his arrest.  (Id. at 11.)  In addition, Lugo indicated
that she was willing to act as defendant's third-party custodian should he be
granted release.  (See id. at 6.)  Lugo offered to post security of $10,000 in cash and
the deed to her home, which she valued at $50,000.[5]  (Id. at 7-8.)

On cross examination, Lugo explained that she purchased her home in 2004
with $9,000 in cash.  (Id. at 10.)  An unspecified amount of the purchase money was
contributed by defendant and Lugo's name does not appear on the property deed.
(See id. at 9-10.)  Lugo testified that she has not been employed since 2003, but

---

[5] Lugo testified that her valuation of the home was based solely upon her own
estimates.  (See Hr'g Tr. at 9.)

accounted for the $10,000 in her bank account by disclosing that she "su[ed]

someone" several years prior. (<u>Id.</u> at 16.) Lugo stated that defendant's "real" name

is Alejandro Munoz Cruz, and that he maintains two distinct Pennsylvania driver's

licenses: one identifying him as Cruz, the other as Carlos Santiago-Pagan. (<u>Id.</u> at

16-17.) According to Lugo, defendant used the name 'Santiago-Pagan' "in order to

work," because "that was the name by which he was known."[6] (<u>Id.</u> at 17.) Finally,

Lugo acknowledged that she and defendant recently traveled to Mexico on

vacation. (<u>Id.</u> at 12.)

 Defendant also called his aunt, Migna Perez ("Perez"), to testify. Perez co-

owns a construction business in Reading with her husband, Salomon. (<u>Id.</u> at 20, 22.)

---

 [6] Lugo appeared to have difficulty justifying defendant's acquisition of two separate licenses. When pressed on cross examination, she responded as follows:

| | |
|---|---|
| LUGO: | When I began the process of taking care of [defendant's] papers[,] he used those papers of Carlos Santiago in order to work. But when he fixed his paper he never again used those names. |
| U.S. ATT'Y: | He used that name on the telephone, didn't he? |
| LUGO: | Because that was the name by which he was known. |
| U.S. ATT'Y: | And why is it that he needed another name to work other than his real name? |
| LUGO: | I do not understand the question. |
| U.S. ATT'Y: | If I understand your testimony correctly you testified that because of work he needed other papers or another name. |
| LUGO: | . . . After he got his legal paper he was using the name of Carlos but no longer. |
| U.S. ATT'Y: | Why was it that he needed to use the second name? |
| LUGO: | Well I don't know, if he doesn't know it I don't it less I would know it. |

(Hr'g Tr. at 17.)

Perez stated that she has consistently employed defendant as a laborer for the past several years, and that she would rehire him should he be released.  (Id. at 20-22.) On cross examination, Perez conceded that she had no records of defendant's employment or the amount that he was paid.  (Id. at 23.)  Perez also indicated that defendant's father continues to live in Mexico, where defendant traveled just months before his arrest.  (See id. at 23.)

## II.  Discussion

The Bail Reform Act of 1984 provides that a defendant must be released pending trial unless the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(a).  If there is probable cause to believe that the defendant committed an offense for which the Controlled Substances Act prescribes a maximum term of imprisonment of ten or more years, however, a rebuttable presumption arises that no combination of conditions will ensure the defendant's appearance or assure the community's safety.  See § 3142(e)(2)-(3).  Defendant's indictment by a grand jury for criminal conspiracy, distribution, and possession with the intent to distribute cocaine hydrochloride, cocaine base, and marijuana is *per se* sufficient to support a finding of probable cause under § 3142(e).  See United States v. Suppa, 799 F.2d 115, 119 (3d Cir. 1986) (holding that a grand jury's indictment "is sufficient to support a finding of probable cause . . . under § 3142(e)").  These charges carry a maximum term of life imprisonment under the Controlled Substances Act.  See 21 U.S.C. § 841(b).

9

Thus, defendant's indictment is sufficient to trigger the rebuttable presumption of § 3142.

In order to rebut the presumption of detention, "[t]he defendant must produce some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." United States v. Carbone, 793 F.2d 559, 560 (3d Cir. 1986). If the defendant is able to meet this burden of production, the government bears the ultimate burden of persuasion. See United States v. Perry, 788 F.2d 100, 114-15 (3d Cir. 1986). Even if a defendant rebuts the presumption of dangerousness or flight, however, "the presumption does not disappear entirely, but remains a factor to be considered among those weighed by the district court." United States v. Farris, No. 2:08cr145, 2008 WL 1944131, at *8 (W.D. Pa. May 1, 2008) (quoting United States v. Abad, 350 F.3d 793, 797 (8th Cir. 2003)); see also United States v. Chagra, 850 F. Supp. 354, 358 (W.D. Pa. 1994); United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). The government must establish proof by a preponderance of the evidence that the defendant poses a risk

of flight;[7] proof that the defendant poses a danger to the community must be

established by clear and convincing evidence.  See United States v. Himler, 797

F.2d 156, 161 (risk of flight standard); Perry, 788 F.2d at 114 (dangerousness

standard).

In assessing a defendant's dangerousness and the likelihood that he or she

will flee, § 3142 requires the court to consider the following:

(1)    the nature and circumstances of the offense charged, including
       whether the offense is a crime of violence, a violation of section
       1591 [18 U.S.C. § 1591], a Federal crime of terrorism, or involves
       a minor victim or a controlled substance, firearm, explosive, or
       destructive device;

(2)    the weight of the evidence against the person;

(3)    the history and characteristics of the person, including—

       (A)    the person's character, physical and mental condition,
              family ties, employment, financial resources, length of
              residence in the community, community ties, past
              conduct, history relating to drug or alcohol abuse, criminal
              history, and record concerning appearance at court
              proceedings; and

       (B)    whether, at the time of the current offense or arrest, the
              person was on probation, on parole, or on other release

---

[7] Section 3142(f) specifically states that "[t]he facts the judicial officer uses to
support a finding pursuant to subsection (e) that no condition or combination of
conditions will reasonably assure the safety of any other person and the community
shall be supported by clear and convincing evidence."  The statute is silent with
respect to the precise standard governing risk of flight determinations.  The Third
Circuit has explained that "Congress acted deliberately in setting forth the burden
for a danger to the community . . . while remaining silent as to the burden for a risk
of flight inquiry."  Himler, 797 F.2d at 161.  Consequently, "the government's
burden in demonstrating a risk of flight is the preponderance of the evidence
standard."  Id.; see also United States v. Cirillo, No. 99-1514, 1999 WL 1456536, at *1
(3d Cir. July 13, 1999); United States v. Abdullahu, 488 F. Supp. 2d 433, 438 (D.N.J.
2007); United States v. Mastrangelo, 890 F. Supp. 431, 436 (E.D. Pa. 1995).  Other
circuits also hold the government to the preponderance standard with respect to
risk of flight.  See Himler, 797 F.2d at 161 (citing cases).

> pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)   the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

§ 3142(g).  The court will address each of these factors as they relate to the instant determination of defendant's dangerousness and risk of flight.

## A.   **Danger to the Community**

A court's consideration of the risk that the defendant poses to the community necessarily entails a "prediction of the detainee's likely future behavior."  Perry, 788 F.2d at 114.  In the matter *sub judice*, the court may presume that if released, defendant will engage in dangerous behavior.  See § 3142(e)(2); see also Perry, 788 F.2d at 114 ("The detainee is not presumed to intend lawful conduct.  Rather, it is presumed that he will act dangerously.").  To rebut the presumption of dangerousness, a defendant charged with a serious narcotics felony "must come forward with some credible evidence that he will not continue to engage in the drug activities with which he has been charged."[8]  Chagra, 850 F. Supp. at 358 (citing

---

[8] When Congress amended the Bail Reform Act to include the rebuttable presumption of detention, it explicitly found that

> drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity.  Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism.

S. Rep. No. 98-225, at 20 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3203.

United States v. Hare, 873 F.2d 796, 799 (5th Cir. 1989), and United States v. King,
849 F.2d 485, 488 (11th Cir. 1988)).  Testimony from co-workers, family members,
neighbors, friends, and physicians concerning the defendant's character, health, or
family circumstances may be probative on the inquiry.  See Suppa, 799 F.2d at 120;
Perry, 788 F.2d at 115; Farris, 2008 WL 1944131, at *10; Chagra, 850 F. Supp. at 358.

        The court finds that defendant has not rebutted the presumption that he
poses a continuing danger to the community if released.  Defendant presents
evidence that he has no prior criminal record, that he has appeared for each of the
court proceedings in the above-captioned matter, and that he has no history of drug
or alcohol abuse.  (See Hr'g Tr. at 7-8, 18.)  Lugo and Perez also attested to
defendant's relatively stable employment history, but both conceded that he was
unemployed at the time of his arrest.[9]  (See id. at 11-12, 22-23.)  Although this
evidence is probative of defendant's general history and characteristics, rebuttal of
the presumption of dangerousness requires a showing that defendant's criminality
is a thing of the past.  The court heard no testimony relating to defendant's moral
integrity, respect for the law, or personal reliability; such evidence is not only

---

        [9] Defendant's evidence of prior employment is certainly probative of his
history and characteristics uner § 3142(g)(3), but the testimony's probative force is
diminished by its questionable credibility.  Lugo and Perez offered few specifics
and neither witness provided any documentary evidence to verify their assertions
with respect to defendant's employment history.  (See id. at 11, 23.)  Perez's
testimony was especially dubious on this point; she claimed that she employed
defendant for a number of years, but was unable to offer details regarding the
amount defendant was paid, the frequency with which he worked, or even his
hourly wage.  Thus, the court discredits this testimony.

helpful, but is often crucial to an effective rebuttal of the statutory presumption, especially in cases involving serious narcotics distributors.  See, e.g., Chagra, 850 F. Supp. at 358.

Even if defendant had successfully rebutted the presumption, however, the government has proven defendant's continued dangerousness by clear and convincing evidence.  First, the nature of the crime charged weighs heavily against release. § 3142(g)(1).  Defendant was indicted for conspiracy, distribution, and possession with the intent to distribute a significant quantity of narcotics:  five kilograms or more of cocaine hydrochloride, fifty grams or more of cocaine base, and marijuana.  (See Docs. 1, 31.)  These charges amount to strong allegations, supported by probable cause, that defendant was a significant drug distributor at the time he was apprehended.  Furthermore, defendant's crimes subject him to a potential term of life imprisonment.  See 21 U.S.C. § 841(b).  The nature and circumstances of the offense charged thus strongly weigh against defendant's release.

Next, the weight of the evidence supporting defendant's indictment is significant.  See § 3142(g)(2).  The government's evidence includes several hundred transcriptions of intercepted telephone communications, visual surveillance reports compiled by law enforcement officers, and the seizure of approximately one kilogram of cocaine hydrochloride from defendant's vehicle.  Defendant asserts that this evidence is "very weak" and based upon "innocuous" telephone conversations that contain no evidence of criminal activity.  (See Docs. 111 at 3; 139 at 3.)

14

According to defendant, the "intercepted telephone conversations make no references to drug transactions or cocaine or marijuana or money amounts for drug purchases.  The transcripts only contain references to food and vegetables and numbers which could mean anything."  (Doc. 139 at 3.)  The court disagrees.

The telephone transcripts demonstrate that in August 2008, defendant and his co-conspirators made repeated efforts to arrange a purchase of narcotics from a drug distributor named Hugo in North Carolina.  On August 22, defendant traveled to North Carolina and met with Hugo, all the while under surveillance by law enforcement officers.  Soon after this meeting, defendant's vehicle was searched and one kilogram of cocaine hydrochloride was seized.  The seizure of narcotics provides compelling support for the government's argument that defendant's intercepted conversations concerned drug transactions.  What is more, defendant

presents no evidence to mitigate the seizure of this evidence and it therefore weighs

heavily against his release.[10]

With respect to defendant's history and characteristics, the court heard

evidence that defendant maintains at least two different identities: defendant uses

the name "Santiago-Pagan" in the intercepted telephone communications, but

Lugo claims that his real name is "Alejandro Munoz Cruz." Her attempt to explain

defendant's utilization of a fictitious identity was incredible and largely incoherent.

(See Hr'g Tr. at 16-17.) Defendant's use of multiple identities was simultaneous and

simply depended upon the nature of his conduct and the associates to whom he was

---

[10] Defendant does not directly address the most glaring evidence against him—namely, the cocaine hydrochloride seized from the rear cargo area of his vehicle. At the detention hearing, defendant's counsel asked the court to take judicial notice of defendant's motions to suppress evidence and to quash the government's wiretap. (See Hr'g Tr. at 32.) Because hearings on those motions have yet to occur, the court explained that it would "certainly take into consideration the fact that these pretrial motions have been filed," but indicated that an assessment of the arguments' merits would be improper prior to the suppression hearing. Alternatively, the court offered to postpone ruling on defendant's motion for bail until after the hearings on the motions to suppress and to quash the government's wiretap. Defense counsel then withdrew his request for judicial notice. (See Hr'g Tr. at 32-33.) In defendant's supplemental brief in support of his motion for bail, however, defendant purports to incorporate by reference his motion to suppress and motion to quash the wiretaps. (See Doc. 139 at 3.) Consistent with the court's representations during the detention hearing, the court will take notice of the fact that defendant contests the legality of the cocaine seizure, but this is of no moment for purposes of the instant motion. "The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information" at a bail hearing. See § 3142(f). The court must consider the fact that one kilogram of cocaine hydrochloride was seized from defendant's vehicle and he was thereafter indicted for the same. Both of these details went undisputed in the § 3142(f) hearing. Accordingly, they weigh heavily against defendant's instant motion.

speaking.  Moreover, when defendant was engaged in narcotics activity on the telephone, he used his fictitious identity; the court finds this fact highly probative of the likelihood that defendant will recidivate.

The final § 3142(g) factor poses the ultimate question—the nature and seriousness of the societal danger posed by defendant's release.  § 3142(g)(4).  This factor essentially requires the court to assess the totality of the evidence presented. Defendant's indictment for conspiracy, distribution, and possession of a large quantity of narcotics cuts strongly against his motion for release pending trial.  The seriousness of the crimes alone, in the absence of significant countervailing considerations, allows the court to draw the inference that defendant will simply continue his alleged narcotics activity if released.  See, e.g., United States v. Carter, 916 F. Supp. 193, 195 (N.D.N.Y. 1996) (finding that the nature of the crime charged weighs "most heavily" against a defendant charged with cocaine conspiracy involving more than five kilograms of cocaine under 21 U.S.C. § 841 and § 846); United States v. Duncan, 897 F. Supp. 688, 691 (N.D.N.Y. 1995) (drawing inference of future dangerousness when defendant was charged with trafficking large amounts of cocaine and crack cocaine); see also S. REP. NO. 98-225, at 20 (finding that large-scale drug traffickers generally "pose a significant risk of pretrial recidivism").  Defendant's circumstances are made all the more troubling by his attempt to traffic narcotics across several state lines and his maintenance of multiple identities to do so.

17

The court finds that no combination of conditions will reasonably assure the safety of the community if defendant is released pending trial. The court is convinced of defendant's continuing dangerousness by clear and convincing evidence. <u>See</u> <u>Perry</u>, 788 F.2d at 114. Detention pending trial is appropriate on this ground.

### B.   <u>Risk of Flight</u>

In order to justify pretrial detention, the government must demonstrate by a preponderance of the evidence that no combination of conditions will ensure defendant's appearance at trial. <u>Himler</u>, 797 F.2d at 161. Section 3142 lessens the government's burden of persuasion with respect to the risk of flight because "flight to avoid prosecution is 'particularly high among those charged with major drug offenses;'" thus, there is a strong probability that "no form of conditional release will be adequate to secure [a defendant's] appearance." <u>United States v. Martir</u>, 782 F.2d 1141, 1144 (2d Cir. 1986) (quoting S. REP. NO. 98-225, at 7 & n.18). In the instant matter, the offense for which defendant is charged triggers the statutory presumption of detention. Defendant offers testimony suggesting that he has strong familial ties to the Reading area, that he has maintained steady employment therein for the previous eight years,[11] and that he has no criminal record. The court finds this evidentiary production—underwhelming as it is—sufficient to rebut the

---

[11] The court reiterates its doubts regarding the credibility of this assertion, but acknowledges that the testimony carries some probative value regarding defendant's character. <u>See</u> <u>supra</u> note 9 and accompanying text.

presumption of flight, shifting the burden of persuasion to the government.[12]  See

Chagra, 850 F. Supp. at 358 (explaining that a defendant's burden of production is

"light").

After analyzing the § 3142(g) factors, the court finds that the government's

proof in support of continuing pretrial detention is clear and convincing.[13]  See

Himler, 797 F.2d at 161 (instructing courts to analyze § 3142(g) factors for risk of

flight inquiry).  Defendant is charged with the commission of a serious narcotics

felony, for which he is subject to a potential punishment of life imprisonment.  See

21 U.S.C. § 841(b).  Defendant's indictment is supported by significant evidence,

including incriminating telephone communications and the seizure of one kilogram

---

[12] Defendant contends that the likelihood that he will flee is mitigated by the fact that Lugo is willing to act as third-party custodian on his behalf.  (Hr'g Tr. at 6.) Lugo has also offered to post the deed to her home and $10,000 in cash to secure her husband's release.  (Id. at 7-8.)  The court finds that this proffer is of questionable significance.  The value of Lugo's home is uncertain and she admits that defendant contributed at least a portion of the assets used to purchase the property. Furthermore, although Lugo has been unemployed for six years, she claims to have $10,000 remaining from a civil lawsuit in a bank account.  Lugo offered no details regarding this suit, and in light of her husband's leading role in a wide-ranging narcotics distribution conspiracy, the court is skeptical that Lugo's $10,000 represents the remainder of an erstwhile civil judgment.  Even if Lugo's assets were entirely legitimate, however, the courts finds that the value of the bond offered is insufficient to ensure defendant's appearance in the face of a potential term of life imprisonment.  See United States v. Bailey, 750 F. Supp. 413, 417 (W.D. Mo. 1990) (rejecting motion for bail when defendant was charged with violations of 21 U.S.C. § 841 and his relatives and mother offered to post bond).

[13] Although the government must prove that defendant poses a risk of flight by a preponderance of the evidence, see supra note 7 and accompanying text, the court finds that the government's proof meets the more onerous clear and convincing standard.

of cocaine hydrochloride.  Congress has specifically found that individuals charged

with serious narcotics offenses are likely to flee if released pending trial.  <u>See</u> S.

Rep. No. 98-225, at 7 & n.18; <u>see also</u> <u>id.</u> at 20 ("[F]light to avoid prosecution is

particularly high among persons charged with major drug offenses.  Because of the

extremely lucrative nature of drug trafficking, and the fact that drug traffickers

often have established substantial ties outside the United States . . . , these persons

have both the resources and foreign contacts to escape to other countries with

relative ease in order to avoid prosecution for offenses punishable by lengthy prison

sentences.")  The court considers such findings extremely compelling.

Consequently, the nature and circumstances of the offense and weight of the

evidence against defendant strongly counsels against defendant's release.

Furthermore, defendant's history and characteristics support the probability

that he will flee if given the opportunity.  The record indicates that although

defendant has lived with Lugo in Reading for nine years, he is a Mexican national

legally residing in the United States.  (<u>See</u> Doc. 139, Ex. C.)  Defendant's father

remains in Mexico, where defendant recently traveled to visit.  Defendant

maintains two separate identities, at least one of which is fictitious.  <u>See</u> <u>Chagra</u>,

850 F. Supp. at 359-60 (refusing bail when defendant charged under 21 U.S.C. § 841

used several fictitious names and maintained at least two driver's licenses).  Most

importantly, defendant is subject to a potential term of life imprisonment.  <u>See</u>

<u>United States v. Cook</u>, 530 F. Supp. 2d 195, 198 (D.D.C. 2008) (rejecting defendant's

bail motion when defendant demonstrated strong community ties and stable

employment but faced a potential life sentence for distributing narcotics under 21 U.S.C. § 841).  There is every reason to believe that, given the opportunity, defendant would flee to Mexico.  The court therefore finds that no combination of conditions will reasonably ensure defendant's appearance at trial.  The motion for bail will be denied.

**III.**  **<u>Conclusion</u>**

For the foregoing reasons, the court finds that no condition or combination of conditions will reasonably assure defendant's appearance at trial and the safety of any other person and the community.  Defendant's motion for pretrial release must therefore be denied.

An appropriate order will issue.


<u>  S/ Christopher C. Conner  </u>
CHRISTOPHER C. CONNER
United States District Judge


Dated:  April 23, 2009

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:08-CR-0424-01** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **CARLOS SANTIAGO-PAGAN,** | : | |
| | : | |
| **Defendant** | : | |

## <u>ORDER</u>

AND NOW, this 23rd day of April, 2009, upon consideration of defendant's

motion (Doc. 103) for bail pending trial, and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that defendant's motion (Doc.

103) is DENIED.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge