# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | : CRIMINAL NO. 1:08-CR-0424-01 |
| v. | : (Judge Conner) |
| **CARLOS SANTIAGO-PAGAN**, | : |
| Defendant | : |

## MEMORANDUM

Presently before the court is defendant Carlos Santiago-Pagan's motion (Doc. 93) to suppress evidence that was seized during a traffic stop on August 23, 2008. The court held an evidentiary hearing on defendant's motion on April 28, 2009, (see Doc. 160 at 1), after which defendant filed a supplemental brief in support of his position, (see Doc. 162). For the reasons that follow, the motion will be denied.

## I. Findings of Fact[1]

On November 19, 2008, a grand jury indicted defendant and four alleged co-conspirators on charges of criminal conspiracy to distribute and possess with intent to distribute cocaine hydrochloride and marijuana in violation of 21 U.S.C. § 846, and intentional and knowing distribution and possession with intent to distribute cocaine hydrochloride and marijuana in violation of 21 U.S.C. § 841(a)(1). (See Doc. 1.) A superseding indictment was returned on December 10, 2008, which, in

---

[1] These findings are based on testimonial and documentary evidence presented at the hearings on the motion to suppress, as well as the record of the case. The findings substantially reflect the testimony of the officers who participated in the investigation; the court deems this testimony to be credible and, indeed, compelling.

addition to the counts contained in the original indictment, charged defendant with distribution, possession with intent to distribute, and conspiracy to distribute fifty or more grams of cocaine base.  (See Doc. 31.)  Defendant pled not guilty to the superseding indictment on January 7, 2009.  (See Doc. 61.)

The investigation into defendant's involvement in narcotics trafficking originated in July 2008, when agents in the Harrisburg, Pennsylvania office of the Drug Enforcement Administration ("DEA") initiated a court-authorized wiretap on a cellular telephone belonging to Juan Matos ("Matos").[2]  Agent Mark O'Donnell ("O'Donnell") testified that between July 27 and July 31, 2008, agents intercepted several telephonic communications wherein Matos contacted defendant and requested a supply of marijuana or cocaine.  (See Doc. 160 at 24-27.)  Based in part on these intercepted communications, Harrisburg DEA agents obtained court authorization to establish a wiretap on defendant's cellular telephone.[3]  (See id. at 30.)  Defendant was thereafter overhead conversing with an individual named Hugo Soria ("Soria"), a "known drug trafficker" residing in Greensboro, North Carolina.[4]  (See id. at 30, 85.)  On August 16, 2008, Soria told defendant that he could obtain as

---

[2] Matos was indicted along with defendant on November 19, 2008.  (See Doc. 1.)

[3] Defendant has separately moved to quash this wiretap and to suppress the evidence derived therefrom.  (See Doc. 95.)

[4] Agent William Kinghorn testified that Soria was himself the target of a DEA investigation in Greensboro, North Carolina.  (Doc. 160 at 65-66.)  Furthermore, several of Soria's family members have been arrested, charged, and convicted of narcotics-related offenses.  (See id. at 85-86.)

2

much as ten kilograms of cocaine, provided that defendant traveled to North Carolina to purchase the narcotics. (See id. at 30-31.) Defendant indicated that he was seriously considering this option.[5] (See id. at 30-32.)

Defendant and Soria spoke several times on August 21, 2008. (See id. at 32.) During these conversations, Soria repeatedly emphasized that he had access to a "quantity of narcotics." (Id.) Defendant then made arrangements to meet with Soria in Greensboro in order to acquire several kilograms of cocaine. (See id. at 32-33.) On August 22, defendant began traveling south toward North Carolina in a Honda Odyssey minivan. (Id. at 33.) He was accompanied by Delilah Galan ("Galan") and indicted co-conspirators Angel Guzman ("Guzman") and Carlos Perez ("Perez"). (See id. at 38.) Harrisburg DEA agents visually surveilled the minivan until it stopped briefly in Virginia, at which time they surreptitiously affixed a GPS tracking device to the vehicle. (Id. at 33-34.) This allowed DEA to continue monitoring the Odyssey's progress from afar. (See id.)

As the minivan approached the North Carolina border, DEA agents in Harrisburg contacted their counterparts in Greensboro. (Id. at 34-35.) Harrisburg agent Eric Stouch ("Stouch") relayed to Greensboro agent William Kinghorn

---

[5] In addition, defendant asked Soria whether he could purchase the cocaine for $29,000 per kilogram. (Doc. 160 at 30-31.) Soria was non-committal, which prompted defendant to state, "Well, at least give them to me at two with the nine to make one peso." (Id. at 30.) O'Donnell explained that this was code, which he interpreted as follows: "I take that to mean [that defendant] would want to make $1,000 off it. So he could buy [one kilogram] at $29,000 and turn around and sell it for $30,000." (Id.)

3

("Kinghorn") the information intercepted via wiretap; that defendant was traveling to North Carolina "to acquire some cocaine"; the location and description of the Honda Odyssey; and the fact that there was a warrant outstanding for defendant's arrest.[6] (See id. at 35, 62.) Over the course of the following twenty-four hours, agents in Harrisburg maintained regular contact with those in Greensboro, relaying information intercepted from telephone communications between defendant and Soria. (See id. at 35-36.)

At approximately 4 a.m. on August 23, defendant and his traveling companions checked in to a Red Roof Inn in Greensboro. (See id. at 38-39.) Kinghorn and his fellow agents established visual surveillance within fifteen minutes. (Id. at 62-63.) At 8:20 a.m., Soria arrived driving a gray Chrysler 300. (See id. at 65-66.) Defendant thereafter emerged from his hotel room, entered Soria's vehicle on the passenger side, and remained seated in the passenger seat conversing with Soria for fifteen minutes. (Id. at 66.) At the conclusion of this conversation, defendant exited Soria's vehicle and returned to his hotel room; Soria then drove away. (Id. at 67.) O'Donnell testified that based upon the telephone calls exchanged between defendant and Soria around the time of this meeting, Soria was still awaiting delivery of the narcotics that he intended to sell to

---

[6] The warrant for defendant's arrest was issued pursuant to defendant's sale of marijuana on two occasions to undercover Pennsylvania state police officers. (See Doc. 160 at 39-40.)

defendant.  (See id. at 36-37.)  At the time of their morning rendezvous, however, those narcotics had not yet arrived.  (See id.)

Between 11 a.m. and noon, defendant, Galan, Guzman, and Perez checked out of the Red Roof Inn and in to a nearby Comfort Inn.  (See id. at 69.)  During the next several hours, defendant continued to speak with Soria via telephone regarding the purchase of narcotics.  (See id. at 69-70.)  Soria eventually contacted defendant and explained that he was unable to obtain any cocaine.  (See id.)  Defendant then telephoned an unknown individual and lamented that he had traveled to North Carolina to see Soria, and that he "came with the birth certificates, but the family never arrived."  (Id. at 37.)  According to O'Donnell, defendant was speaking in code; he traveled to Greensboro "with money to buy a quantity of narcotics, but the drugs never came."  (Id.)

Defendant, Galan, Guzman, and Perez began the return drive to Pennsylvania empty-handed.  (See id. at 69-70.)  Shortly after leaving, however, Soria contacted defendant and stated, "I have seven people for you to work with." (Id. at 38.)  O'Donnell explained that this was code meaning that Soria had obtained seven kilograms of cocaine.  (See id. at 38.)  Defendant then agreed to return to Greensboro to purchase the narcotics.  (See id. at 71.)  Harrisburg agents—who intercepted this conversation via the wiretap on defendant's telephone—relayed the information to Kinghorn.  (Id.)  Greensboro agents thereafter resumed visual surveillance of the Honda Odyssey, which they located at approximately 7:30 p.m., parked outside a Waffle House restaurant in Greensboro.  (See id.)  Fifteen minutes

5

later, defendant and Soria spoke via telephone and arranged a meeting at a nearby McDonald's restaurant. (See id. at 72.) Agents in Harrisburg informed Kinghorn that defendant was "going to meet Hugo Soria to pick up the cocaine." (Id. at 78.)

The Greensboro agents attempted to follow the Honda Odyssey as it traveled to the meeting destination, but lost visual surveillance of the vehicle for approximately ten to fifteen minutes. (See id. at 73-74.) By the time they were able to relocate the minivan, it was parked outside of a nearby Burger King. (Id. at 73.) However, the vehicle's only occupants were Galan and Guzman; defendant and Perez were no longer inside or nearby the minivan. (See id.) Approximately twenty minutes later, defendant telephoned Guzman, requesting that Guzman drive the Odyssey to a nearby British Petroleum gas station where defendant and Perez were waiting. (See id. at 74-75.) In addition, defendant told Guzman that he "had . . . the product" and it was time "to head back north." (Id. at 78.)

Galan and Guzman drove the Odyssey to the British Petroleum station and parked near one of the gasoline pumps. (Id. at 75.) Within minutes, Perez approached the Odyssey from behind and opened the rear hatch. (Id. at 75.) Agent Billy Denney observed Perez "lift[] the rear hatch of the van and lean[] into the left rear side of the back of the van." (Id. at 82.) According to agent Denney, "it looked as if [] Perez had placed something into the van, but [I] could not see if he did or not. It looked as if he did." (Id.) Defendant and Perez then entered the minivan and, approximately three minutes later, it drove away. (See id. 75-78.)

6

As the Honda Odyssey sped away from North Carolina, agents in both the Harrisburg and Greensboro offices believed there was probable cause that the minivan contained narcotics and, consequently, justification for law enforcement to perform a traffic stop. (See id. at 54-55, 79.) Kinghorn explained that

> [i]nitial probable cause was from the Title 3 intercepts, along with the conversation that [defendant] was coming down to pick up drugs. The visual surveillance of . . . Mr. Perez putting something into the vehicle . . . . Your typical hotel interdiction identifiers, they traveled from Pennsylvania, they go to one hotel room, pay cash. They go to another hotel room, pay cash. They drive around aimlessly. They meet with a known drug trafficker, and they leave the area. They come back, they meet, and they leave again.

(Id. at 78-79.) Having reached this conclusion, Kinghorn contacted the Guilford County sheriff's department and solicited their assistance to stop and search the minivan. (See id. at 79.) Kinghorn explained the basis of the probable cause and that much of the evidence for the stop was derived from the wiretap, a fact DEA was not keen on exposing to the occupants of the Odyssey. (See id. at 79.) Thus, Kinghorn requested that the Guilford County sheriff's deputies attempt to "find" probable cause of a motor vehicle violation in order to justify the stop.[7] (See id. at 79-80.) If the responding deputies were unable to identify any such violations, however, Kinghorn instructed that the Odyssey should nonetheless be stopped and searched based upon the existing evidence. (Id. at 80.)

---

[7] Kinghorn testified that the attempt to "find" probable cause of a motor vehicle violation was intended to prevent defendant from suspecting that he was the subject of a wiretap. (See Doc. 160 at 79-80.) At the time of defendant's arrest, Harrisburg agents continued to monitor the telephones of Matos and one other trafficking suspect. (See id. at 18-19.)

7

Kinghorn's directive was relayed to Guilford County sheriff's deputy Chris Shay ("Shay"), whose police cruiser was positioned in a supermarket parking lot adjacent to highway 220. (See id. at 91, 93-94.) Shay testified that he was instructed by his direct supervisor "to locate [probable cause,] to try to find a traffic violation and perform a traffic stop." (Id. at 93.) Shay understood if he were unable to find probable cause of a traffic violation, "that enough probable cause had been established prior to that to make a traffic stop . . . ." (Id. at 93.)

Shay recognized the Honda Odyssey minivan traveling northbound on highway 220 and followed it for approximately five miles. (See id. at 95.) Unable to observe any motor vehicle violations, Shay stopped the minivan before it crossed the northern county line. (See id. at 94-95.) Galan was operating the vehicle at the time of the stop, and Shay remarked that she appeared "excessively nervous" and was "sweating profusely for the outside temperature." (Id. at 96.) Shay inquired as to "what brought [the Odyssey's occupants] to North Carolina. They said they came down to visit some, visit a cousin of one of the passengers." (Id. at 97.) The vehicle contained no luggage, and Shay observed "more than three" air fresheners in the minivan's interior.[8] (See id. at 97-98, 103.)

Approximately fifteen minutes after Shay initially stopped the Odyssey, Guilford County K-9 officer Herbert Sampson ("Sampson") arrived on the scene.

---

[8] Shay testified that an "excessive number of air fresheners can indicate a vehicle that's been transporting, used to transport narcotics to cover up the smell of some narcotics." (Doc. 160 at 97.)

8

(See id. at 99-100, 110-11.) Sampson approached the minivan and requested that Galan exit the vehicle.[9] (Id. at 114.) According to Sampson,

> Basically I explained to her some indicators that I had seen. I knew that it was a third party vehicle, that there was no luggage, that there was a single key in the ignition, that they had been in town and I told her that, you know, she's extremely nervous, very sweaty, just extremely sweaty from her face, heavy breathing, and that I felt that there was some criminal activity afoot and if she would consent to me searching and doing a dog sniff of the vehicle.

(Id. at 114-15.) Galan then consented to Sampson's request.[10] (Id. at 115.) Sampson deployed Rex, Guilford County's narcotics-sniffing canine,[11] to perform a scent inspection of the vehicle. (See id. at 115-17.) Almost immediately, Rex alerted to the presence of narcotics in the rear of the Odyssey. (See id. at 115-16.) When Sampson opened the rear hatch, he discovered a plastic bag containing one kilogram of cocaine. (See id. at 116.)

---

[9] Sampson testified that prior to his arrival on the scene, "I was privy to the surveillance that was going on. I knew the activities, the purpose why I was there was to make a stop on a vehicle that was suspected to have narcotics." (Doc. 160 at 123.)

[10] At the time Galan provided her consent to search, Sampson's drug-sniffing canine was not present. (Doc. 160 at 125.) Aside from Sampson and Shay, only one other Guilford County sheriff's deputy was on the scene. (See id. at 122.) At no point did any of the officers draw their weapons, though each was armed. (See id. at 98, 113.)

[11] Rex is a canine certified for narcotics detection by the National Criminal Enforcement Association for K-9s. (Doc. 160 at 117.) Rex is specifically certified for cocaine detection. (Id. at 120.)

## II.     Discussion

With limited exceptions, the Fourth Amendment's prohibition against "unreasonable searches and seizures" requires officials to obtain a warrant before searching persons or property. See United States v. Arvizu, 534 U.S. 266, 573 (2002). In the automobile context, police need not obtain a warrant to search a vehicle if "probable cause exists to believe it contains contraband." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see also California v. Carney, 471 U.S. 386, 391 (1985) ("The mobility of automobiles, we have observed, 'creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible.'" (quoting South Dakota v. Opperman, 428 U.S. 364, 367 (1976))); United States v. Johns, 469 U.S. 478, 484 (1984) ("'[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband.'" (quoting United States v. Ross, 456 U.S. 798, 823 (1982))). Probable cause to search a vehicle exists when the totality of the circumstances reasonably indicate that evidence of criminality is contained therein. See Maryland v. Dyson, 527 U.S. 465, 467 (1999); Karnes v. Skrutski, 62 F.3d 485, 498 (3d Cir. 1995); United States v. McGlory, 968 F.2d 309, 343 (3d Cir. 1992).

In the instant matter, defendant argues that the totality of the evidence amounted to nothing more than "an educated guess" that contraband was present within the Odyssey. (See Doc. 94 at 2.) The court disagrees. Prior to defendant's arrest, Harrisburg DEA agents intercepted several telephonic communications wherein defendant discussed the purchase of cocaine and marijuana. Agents

10

listened as defendant and Soria—a known drug trafficker—arranged for a transaction to occur in Greensboro; DEA then followed defendant as he traveled to North Carolina to carry out these arrangements.  Once he arrived in Greensboro, defendant met with Soria multiple times.  He engaged Soria in numerous cellular telephone conversations in order to discus the timing of the anticipated purchase of cocaine.  Agents overheard defendant as he planned the final rendezvous with Soria and, after the purchase had taken place, defendant was heard telling Guzman that he "had . . . the product" and it was time "to head back north."  (Doc. 160 at 78.)  Moments later, agents observed Perez—who accompanied defendant to meet with Soria and purchase the contraband—place something into the rear of the minivan.  The totality of this evidence amounted to far more than sufficient probable cause to believe that the Honda Odyssey minivan contained narcotics at the time that it was stopped and searched.

Defendant next contends that even if the DEA possessed probable cause, the Guilford County sheriff's deputies performing the traffic stop did not.  (See Doc. 162 at 3.)  According to defendant, the sheriff's deputies were merely relayed conclusory information regarding the presence of narcotics inside the Odyssey.  Without personal knowledge of the facts establishing probable cause, however, defendant claims that the deputies were not authorized to stop and search the minivan.  Defendant's contention is incorrect.

Law enforcement officers may reasonably rely upon the probable cause determinations reached by other officers when performing a warrantless search or

arrest.  See United States v. Hensley, 469 U.S. 221, 230-31 (1985); see also Whiteley v. Warden, 401 U.S. 560, 568 (1971); Sharrar v. Felsing, 128 F.3d 810, 827-28 (3d Cir. 1997).  As the Third Circuit Court of Appeals has made clear, "'the legality of a [search and] seizure based solely on statements issued by fellow officers depends on whether the officers who issued the statements possessed the requisite basis to [search and] seize the suspect.'"  Berg v. County of Allegheny, 219 F.3d 261, 270-71 (3d Cir. 2000) (quoting Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997)).  Notably, defendant concedes this tenet of Fourth Amendment jurisprudence, acknowledging that "[p]robable cause can rest upon the collective knowledge of the police rather than solely on that of the officer who actually makes the arrest when there is some degree of communication between both parties."  (Doc. 162 at 3.)  Defendant simply disputes whether, as a matter of fact, sufficient information was relayed by DEA to the Guilford County sheriff's deputies prior to the effectuation of the traffic stop.

Defendant's contention misses the point.  The fact that DEA accumulated evidence constituting probable cause to search the Honda Odyssey is dispositive in this inquiry.  See Berg, 219 F.3d at 270-71.  Once DEA had accumulated probable cause, Kinghorn contacted officers in the Guilford County sheriff's department and relayed the evidentiary basis underlying the determination.  (See Doc. 160 at 79, 87.) Both Shay and Sampson testified to their awareness of the specific facts upon which DEA reached its conclusion, including the wiretap evidence and the visual surveillance.  Even if Shay and Sampson lacked such an understanding, however, DEA's accurate probable cause assessment ends the court's analysis.  See Hensley,

469 U.S. at 231 (stating that the admissibility of evidence "does not turn on whether those relying on [the probable cause determination] were themselves aware of the specific facts which led their colleagues to seek their assistance," but whether the officers reaching the probable cause determination in fact possessed probable cause). The DEA possessed probable cause to believe that narcotics were present in the Honda Odyssey, and the search of the Odyssey by Shay and Sampson was lawful.

## III.  Conclusion

For the foregoing reasons, the court concludes that the search of the Honda Odyssey minivan was supported by probable cause and, consequently, seizure of one kilogram of cocaine was lawful under the Fourth Amendment. Defendant's motion to suppress must therefore be denied.

An appropriate order will issue.

        S/ Christopher C. Conner
        CHRISTOPHER C. CONNER
        United States District Judge

Dated:     June 26, 2009

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 1:08-CR-0424-01** |
| **v.** | : | **(Judge Conner)** |
| **CARLOS SANTIAGO-PAGAN,** | : | |
| **Defendant** | : | |

## **ORDER**

AND NOW, this 26th day of June, 2009, upon consideration of defendant's motion to suppress evidence (Doc. 93), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 93) is DENIED.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge